IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| PENTHOUSE OWNERS ASSOC., INC. | § | PLAINTIFF |
| | § | |
| v. | § | Civil No. 1:07CV568-HSO-RHW |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S, LONDON | § | DEFENDANT |

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT
UNDERWRITERS' MOTION FOR SUMMARY JUDGMENT, AND DENYING
AS MOOT PLAINTIFF'S MOTION TO STRIKE MOTION FOR SUMMARY
JUDGMENT AS TO UNDERWRITERS' REQUESTED DISMISSAL OF
PLAINTIFF'S EXTRA-CONTRACTUAL AND BAD FAITH CLAIMS**

BEFORE THE COURT are the Motion for Summary Judgment [365], filed by

Defendant Certain Underwriters at Lloyd's, London ["Underwriters" or "Lloyd's"] on

September 1, 2010, and the Motion to Strike [371] Underwriters' Motion for

Summary Judgment [365] as to extra-contractual and bad faith claims, filed by

Plaintiff Penthouse Owners Association, Inc. ["Plaintiff" or "Penthouse"], on

September 16, 2010. Both Motions have now been fully briefed. After consideration

of the Motions, the pleadings, the record in this case, and the relevant legal

authorities, and for the reasons discussed below, the Court finds that Underwriters'

Motion for Summary Judgment [365] should be denied, and that Plaintiff's Motion to

Strike [371] should be denied as moot.

I. BACKGROUND

This case was originally filed on April 24, 2007. Compl. [1]. Plaintiff asserts

claims against Underwriters for negligence and/or gross negligence, breach of

contract, and bad faith breach of contract. *Id.* at ¶¶ 22-35. These stem from the

total destruction of the buildings at Plaintiff's condominium complex during

Hurricane Katrina, which struck on August 29, 2005. *Id.* at ¶¶ 11, 21. Plaintiff

notified Underwriters, its insurer under a commercial "all-risk" policy [the "Policy"],

of the purported "covered loss." *Id.* at ¶¶ 7-14. The parties do not dispute that

Plaintiff also filed a claim under its flood insurance policy with The Audubon

Insurance Group for the loss at the complex, and that Plaintiff accepted

$3,610,000.00 in flood insurance proceeds. *See* Audubon Declarations and

Statements of Loss, attached as Ex. "C" to Mot. [365]; Pl.'s Mem. Brief [374] in Supp.

of its Resp., at p. 14; Mem. Brief [366] in Supp. of Mot. for Summ. J., at p. 3.

Underwriters issued a denial letter on July 12, 2006, citing a water exclusion

in its Policy and taking the position that the complex was destroyed by flooding. *Id.*

at ¶¶ 16-18. Plaintiff alleges that Underwriters "failed to fairly, adequately, and

sufficiently investigate and adjust Plaintiff's claim for hurricane damage caused by

Hurricane Katrina." *Id.* at ¶ 15. Plaintiff maintains that "the insured property was

proximately and efficiently damaged by hurricane wind, and other convective

activity prior to the arrival of any storm surge associated with Hurricane Katrina."

*Id.* at ¶ 29.

## II.  DISCUSSION

### A.    Underwriters' Motion for Summary Judgment

#### 1.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) states that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R.
CIV. P. 56(a). The purpose of summary judgment is to isolate and dispose of factually
unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);
*Meyers v. M/V Eugenio C.*, 842 F.2d 815, 816 (5th Cir. 1988).

The mere existence of a disputed factual issue does not foreclose summary
judgment. The dispute must be genuine, and the facts must be material. *Booth v.
Wal-Mart Stores, Inc.*, 75 F. Supp. 2d 541, 543 (S.D. Miss. 1999). With regard to
"materiality," only those disputes or facts that might affect the outcome of the
lawsuit under the governing substantive law will preclude summary judgment. *Id.*
at 543 (*citing Phillips Oil Company v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987)).
Where "the summary judgment evidence establishes that one of the essential
elements of the plaintiff's cause of action does not exist as a matter of law, . . . . all
other contested issues of fact are rendered immaterial." *Id.* (*quoting Topalian v.
Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1987)).

To rebut a properly supported motion for summary judgment, a plaintiff must
present significant probative evidence, since there is no issue for trial unless there is
sufficient evidence favoring the nonmoving party for a jury to return a verdict for
that party. *Booth*, 75 F. Supp. 2d at 543. If the evidence is merely colorable, or is
not significantly probative, summary judgment may be granted. *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 249 (1986). The non-movant may not rely on mere denials
of material facts, nor on unsworn allegations in the pleadings or arguments and
assertions in briefs or legal memoranda. *Booth,* 75 F. Supp. 2d at 543.

2.    Analysis

Underwriters maintain that they are entitled to summary judgment because "[t]here is no evidence in the record that can overcome Penthouse's own admission that flood damage rendered its property a total loss, much less to resolve the contradictory position it manufactured for the purpose of this lawsuit that the property was destroyed *solely* by wind." *Id.* at pp. 1-2 (emphasis in original). Underwriters further contend that Plaintiff "cannot come forward with any evidence of wind damage for any amount, much less an amount exceeding the Policy's $178,000.00 wind deductible, thereby triggering Underwriters' obligation to indemnify." *Id.*

Underwriters argue in the alternative that Plaintiff's "failure to produce any admissible evidence of wind damage, much less its admission that the property was destroyed totally by flood, demonstrates Underwriters had not only an 'arguable basis' to deny this claim, but are due summary judgment." *Id.* at p. 2.  Underwriters contend that the engineer they retained to investigate the site following the storm "confirmed that the property was destroyed by Hurricane Katrina's storm surge, consistent with Plaintiff's claim to its flood carrier." *Id.*  Thus, according to Underwriters, there can be no dispute that its claim decision was reasonable, and that it is entitled to summary judgment on Plaintiff's extra-contractual and bad faith damages claims. *Id.* at pp. 2-3.

-4-

a.      Plaintiff's Contractual Claims Under the Policy

In response to Underwriters' position that Plaintiff has admitted that its property was totally destroyed by flood, Plaintiff points out that Underwriters has not provided sufficient competent summary judgment evidence supporting this assertion.  The Court agrees.  In contrast, Plaintiff has produced evidence that it made no such admission.  *See* Aff. of Ray Deloteus, at ¶ 4, attached as Ex. "S" to Pl.'s Resp. ("After Katrina destroyed Penthouse's property, I made a claim for benefits under Penthouse's flood and Lloyd's policies.  When I made those claims, I did not admit that flood caused damage to the property.  I merely made a claim for benefits under each of the policies.").

Underwriters' bare assertion that Plaintiff has admitted that its property was totally destroyed by flood is unpersuasive.  Based upon the record before it, the Court cannot conclude that Plaintiff has admitted that the property was totally destroyed by flood.  Underwriters has pointed to no such direct admission present in the record, and the Statements of Loss for the flood claim reflect that Penthouse made a claim for its flood policy limits, not its total loss during Hurricane Katrina. *See* Audubon Declarations and Statements of Loss, attached as Ex. "C" to Mot. [365]. While the admission of a party opponent is not hearsay pursuant to Federal Rule of Evidence 801, and can be offered as evidence at trial against the party opponent if otherwise admissible, Underwriters has not pointed the Court to any persuasive authority that such a purported admission is binding upon the Court at the summary judgment stage where it is presented countervailing evidence.

Underwriters further contend that Plaintiff has not submitted sufficient evidence that the value of the property at the time of the loss exceeded the amount Plaintiff has previously recovered under its flood policy plus the amount of the deductible applicable under Underwriters' Policy.  To the extent that this argument depends upon the notion that Plaintiff's recovery under Underwriters' Policy is limited by Plaintiff's purported "admission" of the property's actual cash value contained in the Policy application, combined with the Policy's 5% Windstorm or Hail Percentage Deductible and Plaintiff's flood recovery, such reliance is misplaced.  This Court has previously held that Plaintiff's Policy application "does not establish value and Plaintiff is not 'bound' by the application."  Order [210], at p. 3.  Moreover, Plaintiff has supplied colorable evidence, including the report of its designated expert Mr. Douglas McColl, that its losses resulting from Hurricane Katrina exceeded the combined total of the Policy deductible and flood payment.  *See* Rebuilding Valuation Estimate of Douglas J. McColl, Jr. [373-19], at pp. 1-2, attached as Ex. "J" to Pl.'s Resp. [373] (finding actual cash value of complex to be $7,554,394.45); Dep. of Douglas McColl [373-20], at pp. 29-30, attached as Ex. "J" to Pl.'s Resp. [373].

In their Reply, Underwriters insist that Mr. McColl's opinion on value, as well as another expert's testimony relied upon by Plaintiff, "have no relationship whatsoever to the amount of wind or flood damage to the complex following Hurricane Katrina."  Reply [376], at pp. 2-3.  The Court agrees that Mr. McColl's report does not, by itself, supply an estimate as to the amount of wind or flood

damage to the complex.  However, Mr. McColl is not offered as a causation expert.

Rather, Plaintiff has designated him "as an expert in the field of property value

(including actual cash value) and damages . . . ."  Pl.'s Expert Designation and Notice

of Service [310], at p. 1.  As discussed in more detail herein, Plaintiff has designated

a different expert to establish the purported cause of loss in this case.

In an apparent reference to Mr. McColl's opinion, Underwriters further assert

that his valuation "included the substantial costs of rebuilding the interior

eighty-four individual units that are not owned by Penthouse (which makes it

irrelevant)."  Reply [376], at p. 3.  Based upon the record before it at this time, the

Court is of the opinion that this argument goes more to the weight to be afforded Mr.

McColl's testimony by the jury, and not to its admissibility at the summary

judgment stage.[1]

The crux of the parties' dispute with respect to Underwriters' Motion for

Summary Judgment appears to be the question of the admissibility of the testimony

of Plaintiff's expert, Dr. Ralph Sinno, as to the cause of Plaintiff's loss.  In

Underwriters' Memorandum Brief [366] in Support of their Motion, they maintain

that "[t]his Court has already refused to allow Penthouse to present" the argument

that solely wind, not flood, caused the destruction of the condominium complex,

"including the opinion of Penthouse's lone causation expert Dr. Ralph Sinno, finding

that Penthouse could not argue that wind alone caused the loss given its acceptance

_____

[1]  Underwriters have not filed a *Daubert* motion seeking to exclude Mr. McColl.

of more than the insured value in flood limits."  Mem. Brief [366] in Supp. of Mot. for

Summ. J., at pp. 7-8 (*citing* Order [193]).[2]

Plaintiff counters that Dr. Sinno has not been precluded from testifying at

trial, and that he "will testify that the property was rendered useless by wind, then

displaced by Katrina's waters."  Pl.'s Mem. Brief [374] in Supp. of its Resp., at pp. 3-

4.  The Court concurs with Plaintiff's assessment that it has not previously excluded

the substance of Dr. Sinno's proffered testimony,[3] and it will therefore consider Dr.

_____

[2] The Court notes that the Order discussed herein was not entered by the undersigned, as this case was reassigned to the undersigned on March 16, 2009.  *See* Order Reassigning Case [338].

[3] Underwriters filed a Motion [103] to Strike and Exclude the Expert Testimony of Dr. Sinno on April 21, 2008.  On January 29, 2009, the Court entered an Order [307] denying this Motion as moot, in light of its ruling [166] that the cause of damage to the property was no longer an issue in the case.  The previous Order [166] was subsequently reversed and vacated by the Court of Appeals, leaving the question of causation squarely before the Court on this Motion for Summary Judgment, and making Dr. Sinno's testimony relevant.  *See* Fifth Cir. Op. [356].  Underwriters also filed a Motion [336] to Clarify the previous Order [307], which the Court denied without prejudice by Text Order dated July 10, 2009, after the Court granted [347] Underwriters' Motion [342] for Leave to Appeal.

In a separate Order dated July 10, 2008 [193], to which Underwriters refer, *see* Mem. Brief [366] in Supp. of Mot. for Summ. J., at pp. 7-8, the Court granted Underwriters' Motion [149] to exclude evidence, testimony, and argument that Plaintiff's property was destroyed solely by wind.  Order [193], at pp. 2-3.  After reviewing Dr. Sinno's Report and deposition testimony, the Court is not persuaded that his testimony is excluded by this Court's prior ruling [193].  For example, in his Report, he states that:

> The water surge on this site could be a serious threat to the building curtain walls, interior partitions, and contents of the residential house if these walls remained standing by the time the water rise reached significant levels, see Figure 23 and 24.  However, almost all damages from the water surge occurred after the peak high pressure differentials from winds have passed through the constructed Penthouse Condominium facilities.  The water surge for this site was the wash-out of whatever is left from structurally unstable cladding and components.  Curtain and interior walls and partitions, including brick veneer walls on the site, and all personal contents were washed out while the direct and uplift forces from the high velocity winds of the hurricane helped in displacing it in the direction of the wind, north to northwest of the site.

Dr. Sinno's Report [373-23], at p. 29, attached as Ex. "K" to Pl.'s Resp. [373].

Dr. Sinno concluded that

Sinno's opinion on causation as delineated in his written report and deposition testimony. *See* Dr. Ralph Sinno's Prof'l Resume, Report, and Dep. Tr., attached as Ex. "K" to Pl.'s Resp. [373]. Dr. Sinno's testimony clearly creates a question of material fact regarding whether Plaintiff's loss was due, at least in part, to a Covered Cause of Loss, *i.e.*, wind, as opposed to storm surge or flooding.

Moreover, Underwriters' own March 6, 2006, letter report from their investigatory engineers, Rimkus Consulting Group, Inc. [the "Rimkus Report"], upon which Underwriters based its denial, likewise creates a question of fact as to whether Plaintiff's loss was due, at least in part, to wind. *See* Rimkus Report, attached as Ex. "P" to Pl.'s Resp. [373]. This Report clearly acknowledges that some undetermined amount of potentially covered wind damage to the property occurred during Hurricane Katrina. *See id.* at pp. 2-3, 5 ("Indirect evidence suggests that the maximum extent of wind-related damage consisted of partial loss of roof coverings on

---

Based on the known and undisputable facts about the Penthouse Condominium Complex, it is my view that the direct and uplift pressures generated by the high velocity winds of hurricane Katrina caused all of the buildings at the site to fail structurally and to be considered a total loss. The water surge that followed the peak high velocity winds caused sweeping away what had been standing of the structurally failed facilities.

*Id.* at p. 34.

Dr. Sinno reiterated in his deposition that "if you have a weak, failed structure already by wind, if it's unstable, then any horizontal surge will flatten it out." Dep. of Dr. Ralph Sinno [373-24], at p. 54, attached as Ex. "K" to Pl.'s Resp. [373]. When asked about whether storm surge had anything to do with the value of the building, Dr. Sinno explained that he did not "understand the value of the building. That's not engineering." *Id.* at p. 54. Again, Dr. Sinno testified that "[t]he water has nothing to do with the structural damage of this building . . . of the Penthouse condominium building." *Id.* at pp. 54-55. By the time the water got there, "[t]he building was already structurally worthless." *Id.* at p. 55. Reading Dr. Sinno's Report and deposition testimony as a whole, his opinion is not inconsistent with this Court's prior Order [193], as his opinions speak in terms of structural losses, rather than a complete or total loss in insurance or valuation terms. The Court therefore is not persuaded that Dr. Sinno is prohibited from testifying, as Underwriters suggest.

the condominium building and minor cracking of interior drywall and exterior brick veneers.");[4] *see also Corban v. United States Auto. Ass'n*, 20 So. 3d 601, 613 (Miss. 2009) (holding that "loss occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured," and that, once a loss occurs, that particular loss is not changed by any subsequent cause or event).

As far as Underwriters' argument that Plaintiff cannot demonstrate that its "wind damage claim exceeds the windstorm deductible as a precondition of coverage," Reply [376], at p. 1, is concerned, the Court is persuaded that Plaintiff has presented sufficient evidence, at a minimum through Dr. Sinno's and Mr. McColl's reports and testimony, to create a jury question as to whether there was covered wind damage and, if so, whether the amount of loss caused by wind exceeded the 5% Windstorm or Hail Percentage Deductible. Based on the foregoing, material fact questions remain for trial on the issues of whether the property suffered covered wind damage, the amount of any such damage, and the value of the property at the time of the loss. Summary Judgment on Plaintiff's breach of contract claims would therefore be inappropriate.

---

[4] Rimkus also issued a Supplemental Report in October 2007, after Underwriters' initial denial. *See* Rimkus Supplemental Report, attached as Ex. "G" to Mot. for Summ. J. [365]. However, the Supplemental Report mainly disputes Dr. Sinno's opinions and methodology. It does not appear to alter Rimkus' earlier opinions regarding the existence of some wind damage to Plaintiff's property. *See id.*, at p. 7 ("It is our opinion that structures located further inland that were not subjected to storm surge, exhibited limited wind related damage. Since the wind speed, just inland from the debris field of the storm surge, was similar to the wind speed at the coast, the amount of damage at the coast that could be attributed to wind would also be limited.").

b.    Plaintiff's Extra-Contractual and Bad Faith Damages Claims

Underwriters alternatively seek summary judgment on Plaintiff's claims for

extra-contractual and bad faith damages.  The Mississippi Supreme Court has

recently explained that "[e]xtracontractual damages, such as awards for emotional

distress and attorneys' fees, are not warranted where the insurer can demonstrate

'an arguable, good-faith basis for denial of a claim.'"  *United Services Auto. Ass'n v.*

*Lisanby*, 47 So. 3d 1172, 2010 Miss. LEXIS 615, * 11 (Nov. 18, 2010).  "A punitive

damages claim should be decided by a jury if 1) there was no arguable or legitimate

basis for denying coverage, and 2) the insurance company acted with malice or gross

and reckless disregard for the rights of the insured."  *United States Fidelity and*

*Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 970 (Miss. 2008).

Underwriters argue that Plaintiff's "failure to produce any admissible

evidence of wind damage, much less its admission that the property was destroyed

totally by flood, demonstrates Underwriters had not only an 'arguable basis' to deny

this claim, but are due summary judgment."  Mot. for Summ. J. [365], at p. 2.

Underwriters contend that their engineer "confirmed that the property was

destroyed by Hurricane Katrina's storm surge, consistent with Plaintiff's claim to its

flood carrier."  *Id.*  Thus, the argument goes, there can be no dispute that the claim

decision was reasonable, entitling Underwriters to summary judgment on Plaintiff's

claims for extra-contractual and bad faith damages.  *Id.* at pp. 2-3..

With respect to Plaintiff's alleged admission that the property was destroyed

by storm surge, this Court has previously held that:

-11-

> In the event this trial reaches consideration of the issue of punitive damages, Lloyd's will be limited to the presentation of evidence that was in its hands at the time it denied Penthouse's claim with respect to the issue of whether Lloyd's had a legitimate or arguable reason to deny this claim.  On all other issues, Lloyd's will not be so restricted.

Order [189], at pp. 1-2.

Underwriters concedes in its Reply that it did not rely on Plaintiff's flood recovery to deny the claim, stating that, "[w]hile Underwriters did not (or need not) rely on Penthouse's flood insurance recovery to deny the claim, it certainly proves Underwriters' claim decision was correct."  Reply [376], at p. 5.  This argument in favor of summary judgment is unpersuasive.

The record reflects that Crawford & Company ["Crawford"] adjusted the claim on behalf of Underwriters.  Mr. Derrell Livingston of Crawford testified that he was the adjuster handling the loss through June 5, 2006, the date of the last of the seven reports which he filed.  Dep. of Derrell Livingston [373-1], at p. 116, attached as Ex. "A" to Pl.'s Resp. [373].  Mr. Livingston first discussed the property with Ray Deloteus on September 6, 2005.  Dep. of Derrell Livingston [365-8], at pp. 71-72, attached as Ex. "F" to Mot. for Summ. J. [365].

Mr. Livingston drove by the property for an initial inspection in early September, and then made a detailed inspection on October 2, 2005.  *Id.* at pp. 72-73. He issued reports dated, respectively, September 21, 2005; January 23, 2006; February 27, 2006; March 22, 2006; April 19, 2006; May 3, 2006; and June 5, 2006. *See* Crawford Reports, attached as Exs. "B" – "H" to Pl.'s Resp. [373].  All seven reports stated that "Penthouse Owners Association, Inc. was totally destroyed as a

result of the winds and the waves." *Id.*, at p. 2 (of each report).  Likewise, all seven

reports concluded that a "cause of loss," in addition to flooding, was the following:

"Hurricane Katrina, 8/29/05, high winds causing roof, wall, and window damages

resulting in extensive interior water damages throughout the 2 level facility."

September 21, 2005, Crawford Report, at p. 3, attached as Ex. "B"to Pl.'s Resp. [373];

January 23, 2006, Crawford Report, at p. 3, attached as Ex. "C"to Pl.'s Resp. [373];

February 27, 2006, Crawford Report, at p. 4, attached as Ex. "D"to Pl.'s Resp. [373];

March 22, 2006, Crawford Report, at pp. 3-4, attached as Ex. "E"to Pl.'s Resp. [373];

April 19, 2006, Crawford Report, at pp. 3-4, attached as Ex. "F"to Pl.'s Resp. [373];

May 3, 2006, Crawford Report, at p. 4, attached as Ex. "G"to Pl.'s Resp. [373]; and

June 5, 2006, Crawford Report, at p. 4, attached as Ex. "H"to Pl.'s Resp. [373].

     In the first Crawford Report, dated September 21, 2005, Mr. Livingston

relates that "Immediate Concerns" regarding each of the three insured complex

buildings were to "[a]ttempt to determine the damage caused by the winds and the

damage caused by the storm surge.  As there is nothing left on the lot this will be

extremely difficult."  September 21, 2005, Crawford Report, at pp. 4-5, attached as

Ex. "B"to Pl.'s Resp. [373].  He closes by saying that "[w]e are not in a position to

state the damages caused by the winds prior to the storm surge striking the

building."  *Id.* at p. 6.

     The second Crawford Report, dated January 23, 2006, states that "[w]e

recommend and request the assignment of an engineer to determine the damages

caused by the wind and the damages caused by the storm surge."  January 23, 2006,

Crawford Report, at p. 4, attached as Ex. "C" to Pl.'s Resp. [373].  He closes with the

following:

> [w]e are not in a position to state the damages caused by the winds prior
> to the storm surge striking the building.  Please advise your position on
> the hiring of a structural engineer to access [sic] the damages and
> establish the wind versus the storm surge percentages.

*Id.* at p. 5.

In his third Crawford Report, dated February 27, 2006, Mr. Livingston

advises Underwriters' coverage counsel that Plaintiff's flood policy had paid its limits

for each of the insured buildings.  February 27, 2006, Crawford Report, at p. 5,

attached as Ex. "D" to Pl.'s Resp. [373].  In each of the fourth, fifth, sixth, and

seventh, Crawford Reports, dated March 22, 2006, April 19, 2006, May 3, 2006, and

June 5, 2006, respectively, Mr. Livingston states that,

> [w]e are still awaiting the report from the engineer and his
> recommendation in this matter.  We can not stress the importance of
> having the engineer complete his report in a timely manner and forward
> same to the parties involved.

March 22, 2006, Crawford Report, at p. 5, attached as Ex. "E" to Pl.'s Resp. [373];
April 19, 2006, Crawford Report, at p. 5, attached as Ex. "F" to Pl.'s Resp. [373]; May
3, 2006, Crawford Report, at p. 5, attached as Ex. "G" to Pl.'s Resp. [373]; and June 5,
2006, Crawford Report, at p. 5, attached as Ex. "H" to Pl.'s Resp. [373].

Underwriters issued its denial letter on July 12, 2006.  *See* Denial Letter,

attached as Ex. "Q" to Pl.'s Resp. [373].  The letter was written on Crawford

letterhead, with Mr. Livingston's name appearing in the top right corner under the

Crawford logo.  *See id.*, at p. 1.  However, in the copy provided to the Court, under

the complimentary closing "Very truly yours," there is no typed name or signature.

*See id.*, at p. 2.  Mr. Livingston testified that he thought that someone in

-14-

Underwriters' counsel's office drafted the denial letter.  Dep. of Derrell Livingston, at p. 169, attached as Ex. "A"to Pl.'s Resp. [373].  He further testified that, "after going through legal at my corporate office, we put it on our letterhead at the request of the [U]nderwriters."  *Id.*  When asked, "you personally had no knowledge of any information Lloyd's had that they could rely upon to deny the claim," at the point he wrote his June 5, 2006, Report, Mr. Livingston agreed, answering, "[t]hat's correct." *Id.* at p. 201.  He further acknowledged that he gained "no such information between June 5th and the date that denial letter was sent."  *Id.* at pp. 201-02.

According to Underwriters, the "claim decision was based on the engineer's cause of loss findings . . . ."  Reply [376], at p. 18.  The record reflects that the engineering report upon which Underwriters maintain they relied to deny Plaintiff's claim was the March 6, 2006, Rimkus Report, which was some four months prior to the issuance of a denial letter.  *See* Rimkus Report, attached as Ex. "P" to Pl.'s Resp. [373].  The Rimkus Report is addressed to Mr. Livingston at Crawford.  *Id.*, at p. 1. However, Mr. Livingston testified that he never saw a copy of the Report until May 2007.  *See* Dep. of Derrell Livingston, at pp. 163-64, 213, attached as Ex. "A"to Pl.'s Resp. [373].

The Rimkus Report contains signature lines for both a William "Bill" Worsham and a James G. Grover, P.E.,[5] and states that "Mr. William L. 'Bill' Worsham under the supervision of Mr. Jason G. Grover, P .E., performed an on site

---

[5]  The copy of the Rimkus Report contained in this exhibit reflects only Jason Grover's signature.  It is not clear whether Mr. Worsham signed the Rimkus Report as well, though this inquiry is not relevant here.

inspection on January 6, 2006 to evaluate visibly existing conditions at the

property." *Id.* at p. 1.  The Rimkus Report concludes as follows:

1.     Storm surge, caused the structural demolition of the buildings and
       the removal of superstructures from their foundations.
2.     No direct evidence of wind damage to the subject property
       remained.  Similar structures located within 1,000 ft of the subject
       property that were on higher ground and survived the storm surge
       sustained non-structural wind damage to roof coverings.
3.     Wind loads experienced at the subject location were capable of
       causing limited nonstructural damage as detailed in the Analysis
       section of this report.  The action of wind alone was not sufficient
       to cause structural damage to the buildings or remove the
       structures and contents from their original locations.

*Id.* at pp. 2-3.

       In its Analysis section, the Rimkus Report stated that,

       In summary, the buildings were destroyed by storm surge.  Indirect
       evidence suggests that the maximum extent of wind-related damage
       consisted of partial loss of roof coverings on the condominium building and
       minor cracking of interior drywall and exterior brick veneers.  Speculation
       about the degree of interior wetting by rainwater prior to storm surge
       inundation cannot be supported by direct or indirect evidence.

*Id.* at p. 5.

       While it recognizes that there was likely some wind damage to the property,

the March 6, 2006, Report does not attempt to quantify this damage.  In fact,

Underwriters' adjuster, Mr. Livingston, testified that, based upon the Rimkus

Report, he could not make an estimate of either wind damage or water damage.

Dep. of Derrell Livingston [373-1], at pp. 211-12, attached as Ex. "A" to Pl.'s Resp.

[373].  Mr. Grover testified that, after he left Rimkus some time in 2007,

Underwriters' counsel called him and asked him if he "could determine some kind of

percentage for a roof damage that [they] thought might – might be – or some kind of

percentages of damage from wind . . . ."  Dep. of Jason Grover, at p. 88, attached as Ex. "O" to Pl.'s Resp. [373].  She sent Mr. Grover plans or blueprints for the complex structure, and asked if he could determine a percentage of wind damage or percentage of water damage.  *Id.* at pp. 89-90.  Mr. Grover testified that he consulted with someone at Rimkus about the work, and was told not perform it.  *Id.* at pp. 90, 92.  Mr. Grover thought that it was speculative, and that Rimkus did not "want to get into speculating."  *Id.* at pp. 90-91.  Nor are any such percentages of wind or water damage contained in a Supplemental Report Rimkus issued in October 2007.  *See* Rimkus Supplemental Report, attached as Ex. "G" to Mot. for Summ. J. [365].

It is unclear from the current record whether any significant assessment was conducted by Rimkus, Underwriters, Underwriters' adjuster, or anyone else on behalf of Underwriters, to determine whether Plaintiff's losses caused by wind damage to the property actually exceeded the 5% Windstorm or Hail Percentage Deductible, prior to Underwriters' denial of the claim.  While it remains to be seen whether Plaintiff can adduce sufficient evidence to reach the jury on this claim at trial, at least at this stage, genuine issues of material fact exist regarding whether Underwriters acted reasonably or in bad faith in adjusting and denying this claim.  Based on the record evidence currently before it, the Court is not persuaded that Underwriters has met its initial summary judgment burden of demonstrating that there is no genuine dispute as to any material fact, or that it is entitled to judgment as a matter of law, on Plaintiff's extra-contractual and bad faith damages claims.

*See* FED. R. CIV. P. 56(a).  In sum, Underwriters' Motion for Summary Judgment will be denied in its entirety.

B.    Plaintiff's Motion to Strike

Plaintiff's Motion asks the Court to strike the portion of Underwriters' Motion for Summary Judgment which seeks dismissal of Plaintiff's extra-contractual and bad faith damages claims.  Plaintiff maintains that this portion of Underwriters' Motion relies on inadmissible evidence.  In light of the Court's denial of Underwriters' Motion for Summary Judgment in its entirety, the Court need not reach this issue.  Plaintiff's Motion to Strike is now moot.

### III.  CONCLUSION

Considering the record as a whole, and reviewing the evidence presented in the light most favorable to the non-moving party and resolving all doubts in its favor, as the Court must, the Court is of the opinion that there remain genuine disputes of material fact as to Plaintiff's claims against Underwriters.  These disputes include, but are not limited to, whether the insured property suffered direct physical loss or damage caused by wind, a Covered Cause of Loss under the Policy, and if so, the amount of such loss, what the value of the property at the time of the loss was, whether Underwriters had an arguable or good faith basis for denial of Plaintiff's claim, and whether Underwriters committed a wilful or malicious wrong, or acted with gross and reckless disregard for the insured's rights.  For these reasons, summary judgment in Underwriters' favor is inappropriate, and Underwriters'

-18-

Motion will be denied in its entirety. *See* FED. R. CIV. P. 56(a).  Plaintiff's Motion to Strike will be denied as moot.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, for the reasons stated herein, Defendant Certain Underwriters at Lloyd's, London's Motion for Summary Judgment [365], filed on September 1, 2010, should be and hereby is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, for the reasons stated herein, Plaintiff Penthouse Owners Association, Inc.'s, Motion to Strike [371], filed on September 16, 2010, should be and hereby is **DENIED AS MOOT**.

**SO ORDERED AND ADJUDGED**, this the 11th day of January, 2011.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE