IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| PENTHOUSE OWNERS ASSOC., INC. | § | PLAINTIFF |
| | § | |
| v. | § | Civil No. 1:07CV568-HSO-RHW |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S, LONDON | § | DEFENDANT |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT UNDERWRITERS' MOTION TO APPLY
THE POLICY'S COINSURANCE CONDITION AND WINDSTORM OR HAIL
DEDUCTIBLE, AND CALCULATING PLAINTIFF'S COMPENSATORY
DAMAGES RECOVERY UNDER THE POLICY**

BEFORE THE COURT is the Motion to Apply the Policy's Coinsurance

Condition and Windstorm or Hail Deductible [424], filed by Defendant Certain

Underwriters at Lloyd's, London ["Underwriters" or "Lloyd's"].  After consideration

of the Motion, the pleadings, the record in this case, and the relevant legal

authorities, and for the reasons discussed below, the Court finds that Underwriters'

Motion to Apply the Policy's Coinsurance Condition and Windstorm or Hail

Deductible [424] should be granted in part and denied in part.

I. BACKGROUND

This dispute stems from the total destruction by Hurricane Katrina of three

buildings at Plaintiff's condominium complex.  Compl. [1], at ¶¶ 11, 21.  Plaintiff

notified Underwriters, its insurer under a commercial "all-risk" policy [the "Policy"],

of its purported "covered loss."  *Id.* at ¶¶ 7-14.  The parties do not dispute that

Plaintiff also filed a claim under its flood insurance policy with The Audubon

Insurance Group, and that Plaintiff accepted flood insurance proceeds, in the total

amount of $3,632,200.00, for the same buildings covered under Underwriters' Policy. Trial Tr. vol. 8, 1753, Feb. 24, 2011.  Underwriters issued a letter denying coverage under its Policy on July 12, 2006, citing a water exclusion and taking the position that the complex was destroyed by flooding.  Compl. [1], at ¶¶ 16-18.

Plaintiff filed suit on April 24, 2007.  The Complaint asserts claims against Underwriters for negligence and/or gross negligence, breach of contract, and bad faith breach of contract.  *Id.* at ¶¶ 22-35.  It alleges that Underwriters "failed to fairly, adequately, and sufficiently investigate and adjust Plaintiff's claim for hurricane damage caused by Hurricane Katrina."  *Id.* at ¶ 15.  According to Plaintiff, "the insured property was proximately and efficiently damaged by hurricane wind, and other convective activity prior to the arrival of any storm surge associated with Hurricane Katrina."  *Id.* at ¶ 29.

This matter was tried to a jury beginning on February 14, 2011, and concluding on February 24, 2011.  The issues presented to the jury for its consideration were (1) whether Plaintiff's condominium complex buildings, which were insured with Underwriters, suffered some damage during Hurricane Katrina caused by wind acting independently; (2) if so, the actual cash value at the time of Hurricane Katrina of each of the Penthouse complex's three buildings insured with Underwriters; and (3) the amount of damage to each of the three buildings caused by wind acting independently, expressed in terms of actual cash value at the time of Hurricane Katrina.

The jury returned a verdict finding that Plaintiff's buildings did suffer some damage during Hurricane Katrina caused by wind acting independently. Special Verdict Form [411], at p. 1. The jury found that Building 1 (the "storage building") had an actual cash value of $17,500.00 at the time of Hurricane Katrina and suffered $17,500.00 in damage caused by wind acting independently; that Building 2 (the "condominium buildings," or the three main buildings in a horseshoe or "U" shape) had an actual cash value of $7,525,891.00 at the time of Hurricane Katrina and suffered $1,982,445.10 in damage caused by wind acting independently; and that Building 3 (the "pool house" or "recreation center") had an actual cash value of $73,515.00 at the time of Hurricane Katrina and suffered $11,757.10 in damage caused by wind acting independently. *Id.* The damages to each Building caused by wind acting independently exceed the respective 5% deductible for each Building. Plaintiff is therefore entitled to a judgment in its favor on the compensatory phase of the trial based on its breach of contract claim under the Policy.

After the jury returned its verdict, the Court commenced a hearing to resolve whether it should grant Plaintiff's request for punitive and/or extra-contractual damages. The Court concluded that Underwriters had no arguable basis in fact or in law for denying Plaintiff's claim in its entirety, and that Plaintiff is entitled to recover extra-contractual damages on that basis. The Court determined that the issue of punitive damages was not appropriate to submit to the jury in this case. The Court therefore found that, in addition to the compensatory damages award, Plaintiff is entitled to recover extra-contractual damages in the form of attorneys'

fees and expenses, along with prejudgment interest.  Underwriters subsequently

filed the present Motion.

## II.   DISCUSSION

A.    Coinsurance Provision of the Policy

The Coinsurance provision at issue reads as follows:

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a.    We will not pay the full amount of any loss if the value of the Covered Property at the time of the loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1)    Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;
(2)    Divide the Limit of Insurance of the property by the figure determined in Step (1);
(3)    Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and
(4)    Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the limit of insurance, whichever is less.  For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

Policy, Trial Ex. "P-1," at pp. 568000393–4.  The Declarations page of the Policy

provides that the Coinsurance percentage for each of the three covered Buildings in

this case is 80%.  *Id.* at p. 568000367.

Underwriters contend that the Limits of Insurance for Buildings 2 and 3 were

inadequate based on the Coinsurance formula.  Def.'s Mot. [424], at pp. 7–8.  They

maintain that the Coinsurance provision applies to reduce its exposure under the Policy for Buildings 2 and 3. *Id.* Plaintiff responds that "Underwriters' requested relief is contrary to the law of this case." Pl.'s Resp. [430], at p. 1. Plaintiff points to a Memorandum Opinion [290] entered by Judge Senter on January 16, 2009, which determined that the Coinsurance provision formula "must be applied using all of the casualty insurance on the covered property, not just the Lloyd's coverage." Mem. Op. [290], at p. 3. Judge Senter found that the "Limit of Insurance" for each Building would be the total of Plaintiff's flood insurance limit of insurance plus the Underwriters' Limit of Insurance for each Building. *Id.* Plaintiff maintains that this decision was appealed to the United States Court of Appeals for the Fifth Circuit and was not overturned on interlocutory appeal. Pl.'s Resp. [430], at pp. 1, 5–6. According to Plaintiff, the doctrines of law of the case and issue preclusion foreclose Underwriters' argument, and Plaintiff did satisfy the Policy's 80% Coinsurance requirement for each Building. *Id.* at pp. 8–15.

Plaintiff also points to the term "total amount of loss" in Step (3) of the Coinsurance calculation, and argues that the appropriate figures to use here should be the total loss incurred at each Building, regardless of the cause of loss, as opposed to the total loss caused by wind, upon which Underwriters appear to rely in their briefing. *Id.* at p. 16. Under Plaintiff's logic, the Coinsurance provision would not be applicable as all three covered Buildings were total losses. *Id.*

In their Reply [432], Underwriters assert that Judge Senter's earlier ruling "was based on his legally incorrect ruling that both policies provided coverage for

water damage." Def.'s Reply [432], at p. 11. Underwriters argue that this ruling was vacated by the Fifth Circuit and is no longer the "law of the case." *Id.* at pp. 2, 12–13. They insist that the Court should consider this issue anew, and contend that Plaintiff's interpretation of the Coinsurance provision is premised upon a misreading of the "Limit of Insurance" and "Amount of Loss" terms, and ignores the general purpose of coinsurance requirements. *Id.* at pp. 5–11.

The Court is of the view that it need not reach the issue of whether the Fifth Circuit's ruling vacated the portion of Judge Senter's Memorandum Opinion [290] addressing the Coinsurance provision. Nor need it resolve whether Judge Senter's ruling is the "law of the case" or constitutes "issue preclusion." This is because the Court concludes that, for different reasons, the Coinsurance provision as applied to the facts of this case as the jury found them does not operate to reduce Plaintiff's recovery.

B.    Applicable Law

Federal diversity jurisdiction exists here pursuant to 28 U.S.C. § 1332. The Court therefore applies state substantive law and federal procedural law. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1448 (2010) (quoting *Hanna v. Plummer*, 380 U.S. 460, 465 (1965)). In this case, the Court applies Mississippi contract law to interpret the Policy. *See Catlin Syndicate Ltd. v. Imperial Palace of Miss., Inc.*, 600 F.3d 511, 513 (5th Cir. 2010).

In Mississippi, the interpretation of an insurance policy is a question of law.

*Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 609 (Miss. 2009). Following

*Corban*, the Fifth Circuit has explained that,

> [i]n Mississippi, when the terms of an insurance policy are unambiguous, they must be enforced as written. *Miss. Farm Bureau Cas. Ins. Co. v. Britt*, 826 So.2d 1261, 1266 (Miss. 2002). However, if the policy is subject to two reasonable interpretations, the interpretation giving greater indemnity to the insured will prevail. *J & W Foods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So.2d 550, 552 (Miss. 1998). Exclusions and limitations are reviewed stringently; they must be clear and unambiguous. *Id.; see also Corban v. United Svcs. Automobile Ass'n*, 20 So.3d 601, 609 (Miss. 2009) ("Language in exclusionary clauses must be 'clear and unmistakable.'") (citations omitted). An insurer "bears the burden of showing that an exclusion applies and that it is not subject to some other reasonable interpretation that would afford coverage." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 402 (5th Cir.2008).

*Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyds, London*, 612 F.3d 383, 386 (5th Cir. 2010).

"[A]mbiguities do not exist simply because two parties disagree over the interpretation of a policy." *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1157 (Miss. 2010) (quoting *U.S. Fid. & Guar. Co. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008)).

In analyzing the Policy under Mississippi law, the Court is instructed to peruse the disputed clause, scrutinize the use of the same words in clauses in other provisions of the Policy not subject to dispute, and, finally, consult standard and legal dictionaries for definitions of words not defined within the Policy. *Corban*, 20 So. 3d at 608–09. The Court's "role is to render a fair reading and interpretation of the policy by examining its express language and applying the 'ordinary and popular

meaning' to any undefined terms." *Id.* at 609 (quoting *Noxubee County Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1165 (Miss. 2004)).

At issue here is interpretation of the phrase "total amount of loss" contained in Step 3 of the Coinsurance calculation. Policy, Trial Ex. "P-1," at p. 568000394. In the context of this case, Underwriters use the "wind damage loss" suffered by each Building in Step 3 of their Coinsurance calculations. Def.'s Mot. [424], at pp. 6–8. Plaintiff argues that the "total amount of loss" means the actual cash value of each Building, as determined by the jury, since it is undisputed that all three Buildings were total losses. Pl.'s Resp. [430], at p. 17. The significance of the parties' respective approaches is that Underwriters' interpretation of "total amount of loss" would penalize Plaintiff for failing to comply with the Coinsurance provision with respect to recovery on Buildings 2 and 3, while Plaintiff's interpretation would result in no such penalties as to any of the Buildings.

The Policy covers "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Policy, Trial Ex. "P-1," at p. 568000383. It is undisputed that Buildings 1, 2, and 3 were "Covered Property at the premises described in the Declarations." *Id.* It is also beyond dispute that any damage to these covered Buildings caused by storm surge or flooding, either acting independently or concurrently with wind, was not covered, while any damage caused by wind acting independently was covered. *See id.* at p. 568000402; *Corban*, 20 So. 3d at 614–17.

The terms "loss," "amount of loss," and "total amount of loss" are not defined in the Policy.

In *Corban*, the Mississippi Supreme Court cautioned against conflating the terms "loss" and "damage" in interpreting insurance policies. *Corban*, 20 So. 3d at 613. While the Policy here covers "direct physical loss of or damage to Covered Property," Policy, Trial Ex. "P-1," at p. 568000383, the Coinsurance provision speaks in terms of "loss," *id.* at p. 568000393. "A 'loss' is incurred by an insured and typically, but not always, follows 'damage' to his or her property." *Corban*, 20 So. 3d at 613. "[L]oss occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured." *Id.* That loss can be caused by either a covered peril or an excluded peril. *Id.*

This interpretation is consistent with the coverage provision of the Policy here, which affords coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations *caused by or resulting from any Covered Cause of Loss*." Policy, Trial Ex. "P-1," at p. 568000383 (emphasis added). The qualification "caused by or resulting from any Covered Cause of Loss" would be surplusage if "direct physical loss of or damage to Covered Property" meant, in and of itself, loss of or damage to insured property caused solely by a covered peril, such as wind. *See id.*; *see also* Policy, Trial Ex. "P-1," at p. 568000392 ("We will pay for *covered* loss or damage within 30 days after we receive the sworn proof of loss. . . .") (emphasis added).

-9-

The Windstorm or Hail Percentage Deductible clause in the Policy employs the phrase "amount of loss or damage in excess of [the applicable] Deductible" to express the amount Underwriters will pay under the Policy.  Policy, Trial Ex. "P-1," at p. 568000399.  However, the Coinsurance provision uses the term "total amount of loss," not simply "amount of loss," in the formula to be applied to each covered Building.  Contract law requires that, if possible, the Court construe the Policy's language "to give meaning to all of its terms–presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Transitional Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000); *see* Restatement (Second) of Contracts § 203 cmt. b (1981) ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").  Black's Law Dictionary defines "total" as "[w]hole; not divided; full; complete."  BLACK'S LAW DICTIONARY 1528 (8th ed. 2004).  It defines "total loss" as "[t]he complete destruction of insured property so that nothing of value remains and the subject matter no longer exists in its original form."  *Id.* at 964.  The Court concludes that there is only one reasonable interpretation of the phrase "total amount of loss" as used in the Policy's Coinsurance provision, such that this provision is unambiguous.  "Total amount of loss" here means the whole or complete amount of loss to each of Buildings 1, 2, and 3, regardless of the peril.

This interpretation is consistent with the wording of the remainder of the Coinsurance provision.  Underwriters "will not pay the full amount of any loss if the value of the Covered Property at the time of the loss times the Coinsurance

-10-

percentage shown for it in the Declarations is greater than the Limit of Insurance for the property."  Policy, Trial Ex. "P-1," at p. 568000393.  Essentially, in the event of a partial loss, the Coinsurance provision formula might serve to penalize Plaintiff and result in Underwriters not paying the full amount of the loss.  In the event of a total loss, such as occurred here, Underwriters likewise is not paying the full amount of the loss, as the majority of it was born by Plaintiff and Plaintiff's flood policy proceeds.  Under both scenarios, the Court's interpretation of the Coinsurance provision is consistent with the remainder of the provision.

If the Court treats the "Limit of Insurance" in the Coinsurance calculation as the respective Limit of Insurance for each Building as set forth in the Policy, applying the foregoing definition of "total amount of loss" to the Coinsurance provision results in Plaintiff not being penalized as to any of the three covered Buildings.[1]  For Building 2, the following Coinsurance calculations would apply:

(1)     Multiply the value of Covered Property at the time of loss (determined by the jury to be $7,525,891.00) by the Coinsurance percentage (80%), which equals $6,020,712.80;

(2)     Divide the Limit of Insurance of the property ($3,500,000.00) by the figure determined in Step (1) ($6,020,712.80), which equals 0.58132651668752576937401830560661;

(3)     Multiply the total amount of loss ($7,525,891.00), before the application of any deductible, by the figure determined in Step (2) (0.58132651668752576937401830560661), which equals $4,375,000.00; and

(4)     Subtract the deductible (5% of $3,500,000.00, which is $175,000.00) from the figure determined in Step (3) ($4,375,000.00), which is $4,200,000.00.

_____

[1]Underwriters concede that the Coinsurance penalty would not penalize Plaintiff with respect to Building 1.  Mot. [424], at p. 6.

*See* Policy, Trial Ex. "P-1," at pp. 568000367 and 568000393–4; Special Verdict Form

[411], at p. 1.  Thus, the most Underwriters would pay under the Coinsurance provision

would be either the amount determined in Step (4) ($4,200,000.00) or the Limit of

Insurance ($3,500,000.00), whichever is less, which means that Underwriters, at most,

would owe the entire $3,500,000.00 Limit of Insurance for Building 2, under the facts

determined by the jury.  *See* Policy, Trial Ex. "P-1," at pp. 568000393–4.[2]

As for Building 3, the following Coinsurance calculations would apply:

(1)   Multiply the value of Covered Property at the time of loss (determined by the jury to be $73,515.00) by the Coinsurance percentage (80%), which equals $58,812.00;

(2)   Divide the Limit of Insurance of the property ($52,000.00) by the figure determined in Step (1) ($58,812.00), which equals 0.88417329796640141467727674624226.

(3)   Multiply the total amount of loss ($73,515.00), before the application of any deductible, by the figure determined in Step (2) (0.88417329796640141467727674624226), which equals $65,000.00; and

(4)   Subtract the deductible (5% of $52,000.00, which is $2,600.00) from the figure determined in Step (3) ($65,000.00), which is $62,400.00.

*See* Policy, Trial Ex. "P-1," at pp. 568000367 and 568000393–4; Special Verdict Form

[411], at p. 1.  The most Underwriters would pay under the Coinsurance provision as

---

[2]The Coinsurance provision speaks in terms of determining "the most" Underwriters would pay.  However, the Policy only provides coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."  Policy, Trial Ex. "P-1," at p. 568000383.  Thus, Plaintiff's recovery under the Policy is also limited by the jury's verdict as to the amount of independent wind damage suffered by the covered property.  After any Coinsurance provision reduction is applied, Underwriters "will then pay the amount of loss or damage in excess of the Deductible, up to the applicable Limit of Insurance . . . ."  *Id.* at p. 568000399.  Here, the jury determined that the amount of wind damage to Building 2 was $1,982,445.10, which falls well below the Limit of Insurance.

to Building 3 would be either the amount determined in Step (4) ($62,400.00) or the Limit of Insurance ($52,000.00), whichever is less, which means that Underwriters, at most, would owe the entire $52,000.00 Limit of Insurance for Building 3, indicating that no Coinsurance penalty applied under the facts determined by the jury. *See* Policy, Trial Ex. "P-1," at pp. 568000393–4. The jury found that the total wind damage to Building 3 was $11,757.10, which falls below the Limit of Insurance.

Even if "total amount of loss" as used in the Coinsurance provision could reasonably mean either "total amount of loss from wind damage" or "total amount of loss caused by all perils," the Court remains of the opinion that the Coinsurance penalty does not penalize Plaintiff under the facts of this case, since where an insurance policy is subject to more than one reasonable interpretation, the Court is directed to apply that interpretation which favors the insured. *Hicks v. N. American Co. for Life and Health Ins.*, 47 So. 3d 181, 185 (Miss. Ct. App. 2010) (quoting *Progressive Gulf Ins. Co. v. We Care Day Care Ctr., Inc.*, 953 So. 2d 250, 253 (Miss. Ct. App. 2006)); *see also Robichaux v. Nationwide Mut. Fire Ins. Co.*, No. 2010–CA–00109–SCT, 2011 WL 6224472, *4 (Miss. Dec. 15, 2011) ("Where policy language is ambiguous and unclear, it must be resolved in favor of the insured."). Since defining "total amount of loss" as the whole or complete amount of loss to each of Buildings 1, 2, and 3, from any peril favors the insured, the Court must adopt this interpretation.

Moreover, "[w]hen the [Coinsurance provision] is read in its proper context of the policy as a whole, and with the common understanding of how [coinsurance

provisions] operate in insurance policies, any ambiguity about the effect of this language on the scope of the coverage vanishes." *See Penthouse*, 612 F.3d at 387.  A leading Mississippi treatise on the subject has explained that

> [i]n property insurance, co-insurance is an agreement between an insurer and its insured to share a loss pursuant to a given formula after calculating any deductibles.  Most property fires do not destroy more than 60% of the insured property.  As such, an insured that procures insurance in the amount of 60% of a property's value will generally be fully protected for a likely fire loss.  In these situations where they do not receive a premium for the full value of the insured property, insurers expect the insured to share that loss.
>
> The general co-insurance formula works as follows.  Assume a building is worth $100,000 and the insurer has an 80% co-insurance clause, but the property is actually only insured for $60,000.  If the property suffers a $20,000 fire loss, the co-insurance penalty would be computed by this following formula: divide the amount of the insurance ($60,000) by the amount of insurance required (in this example the policy requires 80% of $100,000, or $80,000) and then multiply that quotient by the amount of the loss (which is $20,000).   Under that formula, 60,000/80,000*20,000=$15,000. The $15,000 figure represents the amount of the total loss that the insured would be able to recover under the co-insurance clause.

Miss. Ins. Law and Prac. § 15:23 (citing *Alyseka Condominium Homeowner's Ass'n, Inc. v. American Reliable Ins. Co.*, 2008 WL 2164563 (S.D. Miss. 2008)).

In Mississippi, the purpose of a coinsurance provision appears to be to require an insured to bear a portion of a loss where it did not fully insure its property with the insurer and, consequently, did not pay premiums on the full value of that property.  The Court's application of the Coinsurance provision here is consistent with this purpose.  Plaintiff, had it not procured its flood insurance policy, would have born a majority of its total loss during Hurricane Katrina, because the jury determined that only $2,011,702.20 of the $7,616,906.00 total damage to Buildings 1,

-14-

2, and 3 was caused by wind acting independently.  *See* Special Verdict Form [411], at p. 1.  Even including its flood policy recovery of $3,632,200.00, Plaintiff still bears a portion of its losses, as described in more detail later, since its total recovery under both policies for these three Buildings comes to $5,464,802.20, less than its total loss of $7,616,906.00.  *See id.*; Trial Tr. vol. 8, 1753, Feb. 24, 2011; Policy, Trial Ex. "P-1," at p. 568000367.[3]

    This result appears to be consistent with other applications of coinsurance provisions in general.  *See, e.g., Quaker Hills, LLC v. PacificIndem. Co.*, No. 10 Civ. 421(DAB), 2011 WL 4343368, *5 (S.D.N.Y. Aug. 15, 2011) ("A co-insurance clause divides the risk between the insurer and the insured in the event of a partial loss if the insured has failed to carry insurance up to a certain percentage of the value of the property, typically 80%. . . .   [A]ll of the cases containing a co-insurance clause involved a partial loss, not a total loss."); *Custom Auto Body Co. v. Prososki*, No. A-96-1034, 1999 WL 14492, *6 (Neb. Ct. App. Jan. 12, 1999) ("Coinsurance is an effort to encourage the purchase of greater amounts of insurance by making full recovery of partial losses conditional upon maintaining a ratio (here 80 percent) between the coverage purchased and the actual value of the property.").  In sum, the Court concludes that, while Underwriters' request to apply the Coinsurance

---

    [3]For example, the Limit of Insurance under Underwriters' Policy for Building 1 was $16,000.00, Policy, Trial Ex. "P-1," at p. 568000367, while it suffered $17,500.00 worth of damage, Special Verdict Form [411], at p. 1, and Plaintiff received no flood policy recovery for that Building, Trial Tr. vol. 8, 1753, Feb. 24, 2011.

provision should be granted, Underwriters' request to apply the provision in the manner they suggest should, and will be, denied.

C.    Application of Windstorm or Hail Deductible

Plaintiff does not dispute that the Court should apply the 5% deductible to each covered Building based upon the jury's determination of damage caused by wind acting independently.  Pl.'s Resp. [430], at p. 2.  The Court will therefore grant this portion of Underwriters' Motion and apply the 5% deductible to the losses sustained by each Building utilizing the jury's findings.  *See* Policy, Trial Ex. "P-1," at pp. 568000399–401.

D.    ICC Provisions

Mr. Alfred Gerard Lewando, Jr., testified at trial regarding certain "Increased Cost of Compliance" ["ICC"] benefits Plaintiff received from its flood insurance.  Underwriters take the position that the $15,000.00 in ICC benefits Plaintiff eventually received with respect to Building 3 should be added to the amount of flood policy proceeds Plaintiff received with respect to that Building, so as to reduce Plaintiff's recovery under the Policy.  *See* Trial Tr. vol. 8, 1608, Feb. 24, 2011 (testimony of Alfred Gerard Lewando, Jr.). The relevant proofs of loss were admitted in evidence at trial as Exhibit "D-21."  Subsequently, the parties represented to the Court that they had reached an agreement as to the amount of flood benefits accepted by Plaintiff for each of its covered Buildings.  The Court then read these figures into the record: $0 for Building 1; $3,577,200.00 for Building 2;

and $55,000.00 for Building 3.  Trial Tr. vol. 8, 1753, Feb. 24, 2011.  These figures apparently did not include any ICC payments.

Underwriters contend that the Court should consider all insurance proceeds received by Plaintiff for each of its covered Buildings, including the ICC funds, thereby reducing any recovery under the Policy to the extent Plaintiff's total recovery for each covered Building under the flood policy and the Underwriters' Policy exceeds the actual cash value of each Building.  At work here is the familiar principle that an insured may not receive a double recovery, or, stated another way, that the insured's recovery may not exceed its actual loss.  *See, e.g., French v. Allstate Indem. Co.*, 637 F.3d 571, 581 (5th Cir. 2011) (finding no impermissible double recovery with respect to a bench trial award under a homeowners' policy for wind damage, when the record evidence was sufficient to establish that the actual cash value of the dwelling, which was the insureds' actual loss, exceeded the insureds' combined recovery under their homeowners' and flood policies).  Plaintiff is only entitled to recover for those uncompensated losses actually covered by Underwriters' Policy.  *See, e.g., Tejador v. State Farm Fire and Casualty Co.*, No. 1:05cv679-LTS-RHW, 2006 WL 3257526, *2 (S.D. Miss. Nov. 6, 2006) (holding that indemnity principles apply to a plaintiff's claim for actual damages under the insurance contract he purchased, such that his loss to his property would be the value of the property before the storm and the amount of indemnity for the loss received, if any, from flood insurance coverage).  Plaintiff does not contest the validity of this general principle.  Where the parties disagree is whether the

$15,000.00 in ICC benefits paid to Plaintiff with respect to Building 3 should be added to the amount of flood proceeds received with respect to that Building. *See* Trial Tr. vol. 8, 1608, Feb. 24, 2011 (testimony of Alfred Gerard Lewando, Jr.).

Underwriters maintain that, according to the trial testimony, Plaintiff received an additional $15,000.00, or possibly more, on the "Pool House," or Building 3, under the "ICC provisions" of its flood policy. Mot. [424], at pp. 8–9. According to Underwriters, Plaintiff's maximum recovery for the actual cash value of Building 3, as determined by the jury, should be limited by the previous flood proceeds received, $55,000.00, plus its receipt of $15,000.00 in ICC funds, *see id.*, which would mean that Plaintiff's recovery under Underwriters' Policy would be reduced, *see id.*; Special Verdict Form [411], at p. 1.

Plaintiff responds that "ICC benefits Penthouse received do not relate to the losses to covered property and, thus, do not affect the jury's determination of 'wind damages.'" Pl.'s Resp. [430], at p. 3. Rather, Plaintiff maintains that "[t]he ICC benefits were paid to compensate for the cost Penthouse incurred to raise its structures to comply with new flood elevation requirements. They were not compensation for losses caused 'independently' by wind . . . ." *Id.*

Plaintiff filed various ICC proofs of loss on or about December 13, 2010. Tr. Ex. "D-21"; Trial Tr. vol. 8, 1606–09, Feb. 24, 2011. Three were introduced into evidence at trial. Tr. Ex. "D-21." At issue here is apparently the ICC proof of loss related to National Flood Insurance Program policy number 99-01487710-05ICC [the "Proof of Loss"]. *See id.* This Proof of Loss states that "[a]n increased cost of

-18-

compliance claim was filed on 2/17/2006.  The mitigation option selected was

Demolition and Elevation."  *Id.*  The full amount of ICC insurance applicable was

$30,000.00.  *Id.*  The replacement cost value of the structure was listed as

$80,689.00, while the actual cash value of the building structure was listed as

$67,868.00, *id.*  The "FULL COST OF COMPLIANCE not limited to the amount of

ICC coverage" was stated as $22,753.21.  *Id.*  The amount paid under "Coverage A"

of the flood policy was $55,000.00.  *Id.*  The amount paid under the "ICC Coverage D

(excluding salvage and subrogation)" was $22,753.21.  *Id.*

     The Proof of Loss in this case contains a subrogation provision which

provides

> [t]o the extent of the payment made or advanced under this policy; [sic]
> the insured hereby assigns, transfers and sets over to the insurer all
> rights, claims or interest that he has against any person, firm or
> corporation liable for the loss or damage to the property for which
> payment is made or advanced.  He also hereby authorizes the insurer to
> sue any such third party in him [sic] name.

*Id.*

     The National Flood Insurance Program offers three Standard Flood

Insurance Policy ["SFIP"] Forms:  Dwelling Form, General Property Form, and

Residential Condominium Building Association Policy ["RCBAP"] Form.  44 C.F.R. §

61.13(a); 44 C.F.R. Pt. 61, App. A(1), A(2), and A(3).  Presumably the SFIP Form at

issue here is the RCBAP Form.  While Underwriters marked Plaintiff's flood policy

for identification as "D-47" at trial, this exhibit was not offered or admitted into

evidence.  The Court does not have the actual SFIP Form before it for consideration

of Underwriters' Motion.  However, all three Forms contain similar provisions for

"Coverage A–Building Property" and "Coverage D – Increased Cost of Compliance."
44 C.F.R. Pt. 61, App. A(1), A(2), and A(3).

At issue here is "Building" coverage under the Underwriters' Policy.  Policy,
Trial Ex. "P-1," at p. 568000367.  The "Building" coverage is analogous to the SFIP
"Coverage A–Building Property" under which Plaintiff has recovered flood proceeds.
*See* 44 C.F.R. Pt. 61, App. A(1), A(2), and A(3).  Underwriters' Policy also contains
an "Increased Cost of Construction" provision, which appears analogous to the SFIP
Forms' ICC provisions.  Policy, Trial Ex. "P-1," at p. 568000386–7; 44 C.F.R. Pt. 61,
App. A(1), A(2), and A(3).  Underwriters' Policy states that "[t]his Additional
Coverage applies only to buildings to which the Replacement Cost Option Coverage
applies."  Policy, Trial Ex. "P-1," at p. 568000386.  The Policy further provides that
Underwriters will not pay for Increased Cost of Construction until the property is
actually repaired or replaced at the same or another premises, and unless the
repairs or replacement are made as soon as reasonably possible after the loss or
damage, not to exceed two years, without an extension in writing during the two
years.  *Id.* at p. 568000387.

The applicability of the replacement cost provision of the Policy has been
much litigated in this case.  Underwriters have opposed this form of recovery, and
the Court has denied Plaintiff's repeated requests to receive replacement cost under
the Policy.  Instead, Plaintiff has been limited to recovery of the actual cash value of
its three covered Buildings at the time of loss.  Because Plaintiff was deemed
ineligible for replacement cost coverage under the facts presented at trial, the

Increased Cost of Construction provision of the Underwriters' Policy is not implicated here.

Plaintiff has not recovered under the Policy's Increased Cost of Construction provision, only under its Building coverage, which is most analogous to the flood policy's "Coverage A." ICC funds under the SFIP are not analogous to proceeds under "Coverage A" of the SFIP or under the "Building" coverage under Underwriters' Policy. Unlike "Coverage A" or the "Building" coverage, the ICC funds do not indemnify Plaintiff for the actual damage or loss sustained to Building 3. Therefore, any danger of double recovery with respect to the payment from Plaintiff's flood policy under its "ICC Coverage D" is avoided. Plaintiff has not and will not receive such benefits under the Underwriters' Policy. Based on the foregoing, Underwriters' request to limit Plaintiff's recovery on Building 3 by the additional amount it received under the ICC coverage of its flood policy will be denied. *See, e.g., Robichaux v. Nationwide Mut. Fire Ins. Co.*, No. 2010–CA–00109–SCT, 2011 WL 6224472, *6 (Miss. Dec. 15, 2011) (surplusage of flood proceeds received for replacing the "dwelling" under the flood policy, beyond the value of the dwelling, did not bar recovery under homeowners' Coverage B for "Other Structures," because there was no evidence that the flood payment was intended to compensate for losses to other structures besides the dwelling itself).

E.     Calculation of Plaintiff's Recovery under the Policy

Based on the foregoing conclusions, the following represents the Court's calculations with respect to Plaintiff's entitlement to recovery under the Policy.

-21-

    1.    <u>Building 1</u>

The Limit of Insurance for Building 1 is $16,000.00.  Policy, Trial Ex. "P-1," at p. 568000367.  No Coinsurance penalty applies.  The 5% deductible for this Building is $800.00.  *See* Policy, Trial Ex. "P-1," at p. 568000399.[4]  The jury determined that Building 1 had an actual cash value of $17,500.00 at the time of Hurricane Katrina, and suffered $17,500.00 in damage caused by wind acting independently.  Special Verdict Form [411], at p. 1.  Subtracting the $800.00 deductible from the $17,500.00 covered damage leaves $16,700.00 as potentially recoverable benefits.  The Limit of Insurance is less than this figure, so Plaintiff is only entitled to recover $16,000.00 for Building 1 under the Underwriters' Policy.  Because Plaintiff received no flood insurance payments for Building 1, Trial Tr. vol. 8, 1753, Feb. 24, 2011, there is no threat of double recovery.  Plaintiff is therefore entitled to recover $16,000.00 in compensatory damages for Building 1 under Underwriters' Policy.

    2.    <u>Building 2</u>

The Limit of Insurance for Building 2 is $3,500,000.00.  Policy, Trial Ex. "P-1," at p. 568000367.  There is no Coinsurance penalty.  The 5% deductible for this Building comes to $175,000.00.  *See* Policy, Trial Ex. "P-1," at p. 568000399.  The jury determined that Building 2 had an actual cash value of $7,525,891.00 at the time of Hurricane Katrina and suffered $1,982,445.10 in damage caused by wind

---

[4]To determine the applicable deductible in each instance, the Court multiplies the Limit of Insurance of each Building by 0.05, representing the 5% windstorm or hail deductible, pursuant to the terms of the Policy.  *See* Policy, Trial Ex. "P-1," at pp. 568000399–401.

acting independently.  Special Verdict Form [411], at p. 1.  Subtracting the

$175,000.00 deductible from the $1,982,445.10 covered damage leaves $1,807,445.10

as potentially recoverable benefits for Building 2, which is less than the Limit of

Insurance for this Building.  *See* Policy, Trial Ex. "P-1," at p. 568000367.

Plaintiff received $3,577,200.00 in flood policy benefits for Building 2.  Trial

Tr. vol. 8, 1753, Feb. 24, 2011.  Because the sum of these flood proceeds and the

amount of potentially recoverable wind benefits, $1,807,445.10, comes to

$5,384,645.10, which is less than the Building's actual cash value at the time of the

storm, $7,525,891.00, the Court need not reduce Plaintiff's recovery to prevent

double recovery.  Plaintiff is therefore entitled to receive $1,807,445.10 in

compensatory damages under the Policy for Building 2.

     3.    <u>Building 3</u>

The Limit of Insurance for Building 3 is $52,000.00.  Policy, Trial Ex. "P-1," at

p. 568000367.  No Coinsurance penalty applies.  The 5% deductible for this Building

is $2,600.00.  *See* Policy, Trial Ex. "P-1," at p. 568000399.  The jury determined that

Building 3 had an actual cash value of $73,515.00 at the time of Hurricane Katrina,

and suffered $11,757.10 in damage caused by wind acting independently.  Special

Verdict Form [411], at p. 1.  Subtracting the $2,600.00 deductible from the

$11,757.10 in covered damages leaves $9,157.10 as potentially recoverable benefits

for Building 3, which is below the Limit of Insurance for this Building.  *See* Policy,

Trial Ex. "P-1," at p. 568000367.

Plaintiff received $55,000.00 in flood policy benefits for Building 3.  Trial Tr.
vol. 8, 1753, Feb. 24, 2011.  Because the sum of these flood proceeds and the amount
of potentially recoverable wind benefits, $9,157.10, which comes to $64,517.10, is less
than the Building's actual cash value at the time of the storm, $73,515.00, the Court
need not reduce Plaintiff's recovery under the Underwriters' Policy to prevent double
recovery.  Plaintiff is entitled to receive $9,157.10 in compensatory damages for
Building 3.

### III.  CONCLUSION

Based on the foregoing, Underwriters' Motion to Apply the Policy's
Coinsurance Condition and Windstorm or Hail Deductible [424] will be granted in
part and denied in part.  Based on the jury's verdict and the foregoing calculations,
the Court will award Plaintiff $1,832,602.20 in total compensatory damages under
its Policy with Underwriters.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, for the reasons
stated herein, Defendant Certain Underwriters at Lloyd's, London's, Motion to Apply
the Policy's Coinsurance Condition and Windstorm or Hail Deductible [424], filed on
April 20, 2011, should be and hereby is granted in part and denied in part.
Underwriters' Motion [424] is granted in part to the extent it asks the Court to apply
the 5% windstorm or hail deductible and to limit any double recovery by Plaintiff,
and denied in part to the extent it seeks to penalize Plaintiff under the Policy's
Coinsurance provision and to limit Plaintiff's recovery on Building 3 by the
additional funds it received under the ICC coverage of its flood policy.

-24-

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, for the reasons stated herein, Plaintiff is awarded $1,832,602.20 in total compensatory damages under the Policy.  The Court will enter a separate Final Judgment pursuant to Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 21st day of December, 2011.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE